UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SUPERVALU HOLDINGS, INC., a Missouri Corporation,<br><br>            Plaintiff,<br><br>   v.<br><br>BARBARA MORRIS TESTAMENTARY TRUST; RICHARD R. MORRIS, JR., individually and as co-trustee of the Barbara Morris Testamentary Trust; and RICHARD ANTHONY MORRIS, co-trustee of the Barbara Morris Testamentary Trust,<br><br>            Defendants. | Case No. C09-5351 BHS<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

This is an action for breach of contract. Defendants and Plaintiff have filed cross-motions for summary judgment. (Dkts. 17 and 21). The Court has considered the pleadings filed in support of and in opposition to the respective motions, and the remainder of the file, and **DENIES** Defendants' motion for summary judgment and **GRANTS in part AND DENIES in part** Plaintiff's motion for summary judgment as discussed herein.

## I. INTRODUCTION AND BACKGROUND

Plaintiff Supervalu Holdings, Inc. ("Supervalu") is a grocery wholesaler, supplying retailers, including "independent" grocers, with products to sell to consumers.

ORDER - 1

In 1996, Defendants Richard R. Morris, Jr. and the Barbara Morris Testamentary Trust ("Morris") owned and operated an independent grocery store (the "Store") in Ocean Shores , Washington. The Store was located in an 18,200 square-foot building situated on a portion of a larger tract of real property Morris had purchased in 1974. The Store was (and still is) the only full-service grocery store serving Ocean Shores and the surrounding area. The nearest major grocery store competitor is over 20 miles away in Hoquiam, Washington.

In September 1996, Supervalu paid Morris $100,000 to become the principal wholesale supplier to the Store. On October 1, 1996, Morris granted Supervalu a right of first refusal for the purchase of the Store on the same terms and conditions offered by a third party. The purpose of the first refusal was to give Supervalu an opportunity to keep the Store within its wholesale network should Morris decide to sell. Pursuant to the first refusal, Supervalu would have 60 days to decide whether to match any offer to purchase the Store.

In the summer of 1997, Morris and Associated Grocers, Inc. ("AGI") began negotiating for AGI to buy the Store. On July 24, 1997, AGI sent Morris a letter offering to purchase, among other things not relevant here, the business and assets of the Store. Eventually, AGI and Morris reached an agreement and AGI drafted and executed a letter of intent. The AGI proposal offered to lease the store from Morris along with a specified portion of real property. The proposed lease included a "New Store" provision. This provision, Section 34 of the Lease, provides in relevant part:

> 34. New Store. Tenant shall have the right to have built and lease on a triple-net basis a new store ("New Store") from Landlord on the adjacent property owned by Landlord, its heirs, successors, relatives and other affiliates legally described on Exhibit B hereto (together with any other contiguous property now owned or hereafter acquired by Landlord and any of its affiliates, the "Adjacent Property") of up to 40,000 square feet at any time during the first ten (10) years of the Lease; . . . Such New Store, if any, would be built by Landlord to Tenant's specifications, base rent would be established by multiplying the actual project cost of construction and the then fair market value of the land by the 20-year loan constant that is available to the Landlord at the time construction of the New Store is determined, and the New Store

ORDER - 2

> Lease would have a 20-year primary term with six (6) 5-year extensions. Otherwise, the terms and conditions of the New Store Lease shall be based on and substantially similar to this Lease (but excluding Sections 34 and 35 hereof and with additional provisions relating to common areas, their use and the equitable sharing of the cost of the maintenance thereof). Upon Tenant's election to have built a New Store, and the subsequent opening of such New Store for business, this Lease and the lease obligation of Tenant with respect to the existing Ocean Shores Store would terminate and be replaced by its lease obligation under the New Store Lease.

Dkt. 20, Ex. A, pp. 35-36.

The transaction with AGI triggered Supervalu's right of first refusal, so Morris gave Supervalu notice of the proposed transaction, enclosing the AGI agreement and giving Supervalu the opportunity to step into AGI's shoes.

Supervalu reviewed the offer and asserts that it was confused about the meaning of the term "loan constant." A meeting with Richard Morris occurred in which Supervalu contends Morris orally explained that the "loan constant" meant the interest rate at which he would borrow the money for the project. Dkt. 18 Ex. 3 pg. 13. Supervalu asserts that Morris reaffirmed this position on numerous occasions, indicating that the term "loan constant" meant the simple interest rate on the construction loan for the New Store.

Morris disputes this interpretation of his statements, and states that he was unfamiliar with the term "loan constant" when he received the offer from AGI and had asked AGI for clarification. Morris was informed by AGI that a "loan constant" was the amount of money needed to make the principal and interest payments on the loan, reflected as a percentage of the original principal. AGI provided a mathematical example of how it would apply. It shows that where the interest rate is 8%, the "loan constant" is 10.04%. If the constant were just the interest rate, as Supervalu asserts, it would be 8%, not 10.04%. Further, AGI explained that the "loan constant" formula would apply to the entire cost of construction and land value. Thus, before agreeing to Section 34 of AGI's proposed lease, Morris verified that the "loan constant" used to determine the annual rent for the to-be-built store would

ORDER - 3

cover principal and interest on the loan, and the rent would be based on the cost of building the New Store and the value of the land associated with the New Store . Dkt. 20, Ex. C, p. 43. Morris and AGI signed a letter of intent on July 24,1997. Dkt. 20, Ex. B, pp. 6-11.

On September 19, 1997, Supervalu exercised its right under the first refusal agreement, stating it would assume AGI's position and purchase the businesses on the same terms and conditions as AGI offered. Dk. 20, Ex. F, pp. 2-3. On October 27, 1997, Supervalu entered into the lease agreement with Morris for the Ocean Shores store. Dk. 20, Ex. G, pp. 10-51. The executed lease agreement was identical to that proposed by AGI.

At the same time Supervalu executed the lease, Supervalu entered into a long-term sublease and a supply agreement with the Myers Family Limited Partnership (Myers) to operate the grocery store. Dk. 20, Ex. H, pp. 2-4.

Subsequently, Supervalu and Morris began discussions in regard to the construction of the New Store pursuant to Section 34 of the Lease Agreement. Supervalu had a number of meetings and telephone calls with Morris to discuss building plans, site work, construction financing, lease terms, and projected rent calculations, etc. For the next several years Morris expended in excess of $300,000 in development costs relating to the permitting and plans for the New Store. During this period the parties exchanged drafts of the proposed lease agreement for the New Store. Each objected to the other's proposal as departing from the terms of the existing lease provisions and as not being in compliance with Section 34. Dkt. 20, Ex. J, p. 2.

On November 27, 2001, Morris' attorney, Susan Caulkins, wrote an email to Supervalu explaining the issues Morris had with Supervalu's proposed lease. Ms. Caulkins stated that the position of Morris was that the costs of the project are to be paid on an amortized basis through rent. Ms. Caulkins suggested that the parties stay entirely within the existing lease, with a base rent being the amortization of the construction cost formula

ORDER - 4

together with "all utilities, taxes, insurance, maintenance and other lease charges that are the responsibility of Tenant" and "with [the] additional provisions relating to common areas, their use and the equitable sharing of the cost of the maintenance thereof." Dkt. 20, Ex. K, pp. 52-53.

On December 6, 2001, John Wald, regional counsel for Supervalu, responded to the Caulkins' email setting forth the position of Supervalu. The Wald letter recounted the history of negotiations as understood by Supervalu and stated Supervalu's belief that Morris' proposal would violate the terms of Section 34 in several ways. Most significantly was Morris' interpretation of the term "loan constant." Supervalu expressed its belief that Morris' proposed method of calculating rent was inconsistent with his previous statements and outside the parameters of Article 34, which says rent is to "be established by multiplying the actual project cost of construction and the then fair market value of the land by the 20-year loan constant that is available to the landlord at the time construction of the New Store is determined." Supervalu interpreted this language to mean that the "20-year loan constant" is the interest rate the landlord could obtain for the permanent loan for the construction of the New Store, not the payment rate at which the rent base would be amortized over 20 years as proposed by Morris. The letter concluded by stating that Supervalu hoped that the matter could be resolved through negotiation, rather than litigation. Dkt. 20, Ex. L, pp. 4-7.

Another year passed. In early November 2002, Myers contacted Morris and indicated a renewed interest in moving forward with the New Store. Myers stated that it had appeared that everything was settled except for finalizing the rent." Dkt 20, Ex. M, p. 14. Myers addressed the issue of rent calculation:

> Since last October there has been a disagreement with you over how the rent should be calculated for the new store in Ocean Shores. Under the existing lease, rent for the new store is to be established by multiplying the actual

ORDER - 5

> project cost of construction and the fair market value of the land by the 20-year loan constant that is available to the Landlord at the time construction of the New Store is determined. We have argued that loan constant means the interest rate for your construction loan. Since last October, you have argued that loan constant means the amount required to fully amortize the project cost of the construction and the land value over the 20-year initial term of the lease. The difference between these two opinions represents a very significant increase towards the rent that I have been led to believe I would be paying for the new store location.

Dkt. 20, Ex. M, pp. 15-16. Meyers indicated that litigation was being considered as an option and suggested a number of compromises in an attempt to reach a middle ground. *Id*.

There were no further meaningful discussions between the parties for the next five years. Then, on October 24, 2007 – with only three days left in the ten-year period – Supervalu sent a letter to Morris stating it intended to exercise the right to have the New Store built. Dkt. 20, Ex. O, pp. 19-20. The parties again entered into negotiations. As had been the case in the prior negotiations, the parties were unable to agree to the terms of the lease.

Supervalu then filed this action for breach of contract, for declaratory relief, and for specific performance of the lease terms. Supervalu presently moves for summary judgment requesting the Court find Section 34 of the lease legally enforceable and that Morris' refusal to build the New Store is a breach of contract. Morris has filed a cross-motion for summary judgment requesting the Court declare Section 34 of the lease unenforceable.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the

ORDER - 6

nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**III. CONTRACT FORMATION – ESSENTIAL AND MATERIAL TERMS**

The essential elements of a contract are the subject matter, the parties to the agreement, the promise or matters agreed to, the terms and conditions, including time and manner of performance, and, especially in construction contracts, the price or consideration. *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 31 (1998); *Plumbing Shop, Inc. v. Pitts*, 67

ORDER - 7

Wn.2d 514, 518 (1965); *Bremerton Concrete Prods. Co. v. Miller,* 49 Wn. App. 806, 809 (1987). The essential elements to create an enforceable lease are the same. They are: (1) the subject matter of the contract; (2) the parties thereto; (3) the promise or undertaking; (4) the terms and conditions; and (5) in some jurisdictions the price or consideration. *Family Med. Bldg., Inc. v. DSHS,* 104 Wn.2d 105, 108 (1985); *Saunders v. Callaway*, 42 Wn. App. 29, 36 (1985). There must be mutual assent to the essential terms. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wn. App. 743, 765 (2007). However, not every detail of an agreement is an essential term. *McEachren v. Sherwood & Roberts, Inc.*, 36 Wn. App. 576, 579 (1984).

All the essential and material terms of the contract to build the New Store are contained in Section 34 of the Lease Agreement:

> **The subject matter of the contract:** A new grocery store up to 40,000 square feet to be built by Morris according to Supervalu's specifications upon the "Adjacent Property" owned by the landlord. The Adjacent Property was a defined term that included a legal description of real property immediately east of the current store location.
>
> **The parties**: Richard R. Morris, Jr. and the Barbara Morris Testamentary, as landlord, and Supervalu as tenant.
>
> **The promise:** Morris agreed to build the New Store on the Adjacent Property and to lease it to Supervalu.
>
> **The terms and conditions**: The lease would be on a "triple-net basis" with a "20-year primary term with six (6) 5-year extensions." "[B]ase rent would be established by multiplying the actual project cost of construction and the then fair market value of the land by the 20-year loan constant that is available to the Landlord at the time construction of the New Store is determined[.]" "Otherwise, the terms and

ORDER - 8

conditions of the New Store Lease shall be based on and substantially similar to this Lease[.]"

When interpreting a contract, the court's primary objective is to discern the parties' intent. *Wm. Dickson Co. v. Pierce County*, 128 Wn. App. 488, 493 (2005). Courts give undefined terms their plain, ordinary, and popular meaning, which may be ascertained by reference to standard English dictionaries. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 576 (1998). A provision in a contract is ambiguous when it is fairly susceptible to two different, reasonable interpretations; a contract is not ambiguous simply because the parties suggest opposing meanings. *Martinez v. Kitsap Pub. Servs., Inc.*, 94 Wn. App. 935, 944 (1999).

Where the parties appear to have tried to reach an agreement expressing their intentions, the courts "will not lightly declare a contract void for lack of certainty, but will rather endeavor to discover the true meaning and intent of the parties and give effect thereto." *Westlund Constr. Co. v. Chris Berg,* 35 Wn.2d 824, 833 (1950); *see also Janzen v. Phillips*, 73 Wn.2d 174, 177-178 (1968).

Here the parties' dispute is largely focused on the term "loan constant." The term is defined, in standard real estate dictionaries, as the percentage ratio between the annual debt service and the loan principal. *Barron's Dictionary of Real Estate Terms*, at 260. In other words, a "loan constant" is the annual payment due on a loan (principal and interest) expressed as a percentage of the principal. This is the common use of the term, and is what the drafter of the lease proposal, AGI, indicated to Morris.

Supervalu has not offered any competing dictionary definition for the term "loan constant." Supervalu asserts that Morris defined "loan constant" in oral statements to mean interest only on the actual construction costs and the fair market value of the land. However, Supervalu has presented no admissible evidence to support this assertion. There has been no

ORDER - 9

testimony from any individual identified as having personal knowledge of these purported statements of Morris.

Accordingly, the Court finds that the term "loan constant" has a standard meaning which is the annual payment due on a loan (principal and interest) expressed as a percentage of the principal. In the instant action, that is the amount required to fully amortize the project cost of the construction and the land value over the 20-year initial term of the lease.

Morris claims that Section 34 fails to define "actual project costs," "leased premises," "base rent," and "land," thus making Section 34 unenforceable.

The Court is unpersuaded by Defendants' argument. Under Section 34, the parties agreed to allow Supervalu to have certain discretion in determining the size of the New Store (up to 40,000 square feet), the amount of "land" of the Adjacent Property to be used, and the "actual project cost" of the New Store. All three of these variables, in turn, are then used to calculate the "base rent" with certainty, using the formula as set forth in Section 34. That Supervalu is empowered to define the costs of construction and size of the store (up to 40,000 square feet on the adjacent property) does not make these terms uncertain for the purpose of enforcement of Section 34. "Land" is reasonably certain and is readily determined once Supervalu decided how much land it intended to use to build the size of the store it wanted, and would equate to the amount of the "Adjacent Property" Supervalu required to construct its New Store. Once it is determined how much "land" the New Store would require, this amount is to be appraised and plugged into the base rent formula. The "actual project cost of construction" necessarily turns on the nature and quality of materials included in Supervalu's specifications to build the New Store, loading dock, and parking. Whatever costs Morris incurs to build the New Store and its appurtenances equates to the "actual project cost of construction." The "leased premises" would equate to the New Store,

ORDER - 10

its loading dock, and parking, just as it does in the original lease. With regard to common area maintenance, Section 34 requires the equitable sharing of this expense.

Thus, the meaning of these terms is not unascertainable simply because they are unknown at the time of execution of the lease agreement. The terms become certain upon Supervalu's selection of the size and type of store to be constructed. Once these variables are established, they are plugged into the set formula to establish the base rental rate. Accordingly, the terms are reasonably certain because Section 34 provides a means of determining their precise meaning at the time of performance, i.e. construction of the New Store.

The Court finds the terms of the lease agreement, specifically Section 34, enforceable.

## IV. BREACH OF CONTRACT

The Court having determined the existence of an enforceable contract, Supervalu further requests the Court find that Morris breached the contract/lease in failing to build the New Store. The Court finds that Morris did not commit a breach. Supervalu's attempt to exercise the right to have a New Store constructed departed from the material terms of Section 34. Morris cannot be deemed to have breached the obligation to construct the New Store where Supervalu's proposal altered a material term of the lease agreement, i.e. the calculation of rental payments. Thus, although there exists an enforceable provision requiring Morris to build a New Store, Section 34, Supervalu did not make a valid election to demand construction when it altered the terms of Section 34 in proposing construction. Accordingly, the Court finds that Morris did not breach the duty to construct the New Store.

## V. CONCLUSION

There exist no issues of material fact regarding the enforceability of Provision 34 of the Lease Agreement. The Court finds as a matter of law that Section 34 of the lease is

ORDER - 11

legally enforceable. The Court further finds that Supervalu failed to properly exercise its right to have the New Store constructed pursuant to Provision 34 of the lease.

## VI. ORDER

Accordingly, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 17) is **DENIED**. Plaintiff's Motion for Summary Judgment (Dkt. 21) is **GRANTED IN PART AND DENIED IN PART**. The New Store provision of the parties' lease agreement is legally enforceable. Defendants are found not to be in breach of the parties' lease agreement for refusing to build the New Store on terms significantly different than contained in the lease agreement.

DATED this 6th day of October, 2010.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 12